AO 106 (Rev. 04/10)  Application for a Search Warrant (USAO CDCA Rev. 01/2013)

# UNITED STATES DISTRICT COURT
for the
Central District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>6 Carlina<br>Irvine, California | )<br>)<br>)<br>)<br>)<br>) |

Case No.  **SA15- 72M**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A

located in the _____ Central _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 18, U.S.C. Section 371<br>Title 22, U.S.C., Sections 2778 | See attached Affidavit |

The application is based on these facts:

See attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____/s/_____
*Applicant's signature*

**HSI SA NATHANIEL LEWIS**
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  2/17/15

City and state:  Santa Ana, CA

ROBERT N. BLOCK
*Judge's signature*

HON. ROBERT N. BLOCK, U.S. Magistrate Judge
*Printed name and title*

GS for USAO in ND ILL.  *GS*

# Affidavit of Special Nathaniel Lewis in Support of Application for a Search Warrant

# TABLE OF CONTENTS

FACTS SUPPORTING PROBABLE CAUSE TO SEARCH  2

 A. Overview of the Investigation ..................................................2

 B. Applicable Import and Export Law...............................................3

 C. Roles of the Companies and Individuals Involved .......................5

 D. Vibgyor Optical Systems ...........................................................8

 E. Alpha Precision Industries, Incorporated..................................10

 F. US International Inc.................................................................12

 G. Biomedical-Optics LLC...........................................................13

 H. Fox Valley Machine Parts LLC.................................................16

 I. Evidence of Violations of and Conspiracy to Violate AECA........16

  a. Registration with the Directorate of Defense Trade Controls ..........16

  b. No Licenses to Export Defense Articles to the PRC Have Been Issued to the Subjects of the Investigation................................17

  c. Analysis of Financial Institution Records...........................18

  d. 2008 Trash Pulls............................................................19

  e. August 2008 Customs Seizure.........................................21

  f. November 2008 Customs Seizure .....................................22

  g. XIE and SIDDHARTH VERMA Export a Defense Article to the PRC ...................................................................................24

h.    URVASHI VERMA Exports and Attempts to Export a Defense Article to the PRC.................................................................28

i.    BHARAT VERMA and URVASHI VERMA Export an Item They Believe to be a Defense Article to the PRC.................................32

j.    BHARAT VERMA Attempts to Fraudulently Reroute Shipments Originating in the PRC....................................................43

l.    URVASHI VERMA and BHARAT VERMA Misrepresent the Origin of Certain Defense Articles to Defense Contractor A...................50

m.    Vibgyor Continues to Contract with DOD Prime Contractors and Misrepresent the Location of Manufacture...............................53

    i.    Defense Contractor F...........................................53

    ii.    Defense Contractor G ..........................................55

    iii.    Defense Contractor H ..........................................56

J.    Pen Register Information ..............................................57

K.    Surveillance of the **Subject Premises** ......................................58

L.    Business Records...................................................59

TRAINING AND EXPERIENCE ON DIGITAL DEVICES ...........................................59

CONCLUSION...................................................................65

## AFFIDAVIT

I, Nathaniel Lewis, being duly sworn, state as follows:

1.     I am a Special Agent with Homeland Security Investigations. I have been so employed since 2002.

2.     I am currently assigned to the office of the Los Angeles Special-Agent-in-Charge. I am assigned to the Counter-Proliferation Investigations Center, which is responsible for investigating criminal violations of United States export laws related to munitions, "dual use" commodities, and sanctioned or embargoed countries. I have received formal training in the laws and regulations relating to the Arms Export Control Act (22 U.S.C. § 2778) and the International Traffic in Arms Regulations, and I have participated in investigations of violations of these laws and regulations. I also have participated in the execution of numerous search warrants relating to export-control investigations.

3.     This affidavit is made in support of an application for a warrant to search the premises located at 6 Carlina, Irvine, California, described further in Attachment A (the "**Subject Premises**"), for evidence and contraband described further in Attachment B, concerning the following offenses: conspiracy to violate the Arms Export Control Act, in violation of Title 18, United States Code, Section 371, and violations of the Arms Export Control Act, in violation of Title 22, United States Code, Section 2778. The statements in this affidavit are based on my personal knowledge, and on information I have received from other law enforcement

personnel and from persons with knowledge regarding relevant facts. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth facts that I believe are sufficient to establish probable cause to believe that evidence and contraband concerning violations of Title 18, United States Code, Section 371 and Title 22, United States Code, Section 2778, are located at the **Subject Premises**.

4.     As set forth more fully below, the **Subject Premises** is the residence of Tuqiang XIE and the business premises of Biomedical-Optics LLC, XIE's company. Biomedical-Optics and XIE are engaged in brokering the import of items, primarily optical technology, from manufacturers located in the People's Republic of China. This conduct has included the unlawful export of defense articles to the manufacturers via email, and the subsequent unlawful import of defense articles from the manufacturers, to supply to an Illinois company.

## FACTS SUPPORTING PROBABLE CAUSE TO SEARCH

### A.     Overview of the Investigation

5.     The investigation has revealed that multiple companies engaged in the business of selling defense articles, primarily military optical technology, to the United States Department of Defense ("DOD") and to DOD prime contractors have purported to manufacture the defense articles themselves in the United States. Instead, these companies sent a sample of the item which was the subject of a DOD

contract, and/or its technical data, to manufacturers in the People's Republic of China ("PRC"). Unbeknownst to the DOD and prime contractors, the defense articles were then manufactured in the PRC by using the sample item and/or the technical data provided by the companies, and subsequently shipped to the companies for use in filling the DOD contracts. Many of the items and technical data are regulated by the United States Munitions List and the United States Munitions Import List. As a result, the companies were prohibited from exporting the sample item or technical data to the PRC for manufacture and importing the items that had been produced in the PRC.

      **B.**     <u>**Applicable Import and Export Law**</u>

     6.     In furtherance of its security and foreign policy interests, the United States regulates the export of defense articles and defense services, pursuant to the Arms Export Control Act, 22 U.S.C. § 2778, *et. seq* ("AECA"). The regulations which implement and govern such exports are entitled the International Traffic in Arms Regulations ("ITAR"), 22 C.F.R. Parts 120-130. The ITAR promulgates a list of categories of defense articles and defense services that are subject to control by these regulations. This list is called the United States Munitions List ("USML") and is found at 22 C.F.R. § 121.1.

     7.     Pursuant to 22 C.F.R. § 120.1, the United States Department of State, Directorate of Defense Trade Controls ("DDTC"), administers the ITAR and

regulates the export of defense articles. The ITAR defines "defense article" as including "any item or technical data" designated on the USML. 22 C.F.R. § 120.6.

8.      The ITAR defines "technical data" to include "information, other than software as defined in § 120.10(a)(4) which is required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles. This includes information in the form of blueprints, drawings, photographs, plans, instructions or documentation." 22 C.F.R. § 120.10(a)(1).

9.      No defense article or technical data may be exported, or attempted to be exported, from the United States to a foreign country without first obtaining a license or written approval from the DDTC. 22 C.F.R. § 127.1(a)(1).

10.     The ITAR defines "export" to include "[s]ending or taking a defense article out of the United States in any manner, except by mere travel outside of the United States by a person whose personal knowledge includes technical data," or "[d]isclosing (including oral or visual disclosure) or transferring technical data to a foreign person, whether in the United States or abroad." 22 C.F.R. §§ 120.17(a)(1) and (4).

11.     The permanent importation of defense articles into the United States is regulated by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). *See* 22  C.F.R. § 123.2.

12.     Persons engaged in the business of importing items enumerated on the U.S. Munitions Import List must register by making application on ATF Form 4597. 27 C.F.R. § 447.31. No articles on the U.S. Munitions Import List can be imported into the United States except pursuant to a permit, subject to limited exceptions. 27 C.F.R. § 447.41.

13.     Pursuant to 22 C.F.R. § 126.1(a), "[i]t is the policy of the United States to deny licenses and other approvals for exports and imports of defense articles and defense services destined for or originating in certain countries....This policy applies to countries with respect to which the United States maintains an arms embargo (*e.g.*, Burma, *China*, and the Republic of Sudan) or whenever an export would not otherwise be in furtherance of world peace and the security and foreign policy of the United States." (Emphasis added.).

### C.     Roles of the Companies and Individuals Involved

14.     As further described below, the companies involved in the export of defense articles to the PRC and their registered owners and agents are: (1) Vibgyor Optical Systems, Inc. ("Vibgyor") with registered president BHARAT VERMA and registered secretary ANURADHA VERMA; (2) US International Inc. ("USI") with registered president URVASHI (Bhushan) VERMA; and (3) Alpha Precision Industries, Inc. ("API") with registered president SIDDHARTH VERMA.[1] Vibgyor is

---

[1] On January 14, 2015, Vibgyor, BHARAT VERMA, and URVASHI VERMA were indicted by a federal grand jury in the Northern District of Illinois and charged with

Non-Instrumentality Protocol                                                      Page 5

based in Illinois. USI and API are no longer in operation, but were also based in Illinois.

15.     BHARAT VERMA and ANURADHA VERMA were formerly married and are the parents of URVASHI VERMA and SIDDHARTH VERMA.

16.     Another company, Biomedical-Optics LLC ("Biomedical"), acted as a broker between manufacturing companies in the PRC and Vibgyor and API. Biomedical's registered agent is TUQIANG XIE ("XIE"). Biomedical is operated by XIE at the **Subject Premises**.

17.     An additional company, Fox Valley Machine Parts LLC ("Fox Valley"), currently acts as a broker between Vibgyor and PRC-based manufacturers and between Vibgyor and XIE. WILLIAM BLACK ("BLACK") is Fox Valley's registered agent.

18.     Vibgyor, USI, and API, through BHARAT VERMA, ANURADHA VERMA, URVASHI VERMA, and SIDDHARTH VERMA, individually and, at times, collectively:

a.      exported defense articles on the USML to the PRC and, after the defense articles were manufactured in the PRC, Vibgyor, USI, and API, in turn,

---

offenses related to the investigation; the indictment remains sealed. More specifically, on January 14, 2015, BHARAT VERMA, URVASHI VERMA, and Vibgyor were charged by indictment with conspiracy to violate AECA and defraud the United States, in violation of 18 U.S.C. § 371, and a violation of AECA, in violation of 22 U.S.C. § 2778. In addition, BHARAT VERMA and Vibgyor were charged with money laundering, in violation of 18 U.S.C. § 1956(a)(2)(A). The government intends to execute the requested search warrant contemporaneously with the arrest of BHARAT VERMA and URVASHI VERMA.

imported the defense articles into the United States for later distribution to the DOD and other domestic customers;

      b.    engaged in this export and import activity without the appropriate authorization from the Department of State (export) and ATF (import), and disclosure to the DOD and customers;

      c.    mis-classified, undervalued, disguised the country of origin, and incorrectly described the defense articles manufactured in the PRC in an effort to avoid detection by United States Customs and Border Protection ("CBP") officers;

      d.    entered into manufacturing contracts with DOD prime contractors without informing the companies that the parts would be manufactured outside of the United States and transmitted, via facsimile, requests for quote, contracts, and other documents that materially misrepresented the true location of manufacture;

      e.    Biomedical, through XIE, acted as a broker between manufacturers located in PRC and Vibgyor, USI, and API, transmitted defense articles, namely technical data, to the PRC-based manufacturers, received the manufactured defense articles in the United States to forward to Vibgyor, USI, and API, and facilitated the conduct of BHARAT VERMA, ANURADHA VERMA, URVASHI VERMA, and SIDDHARTH VERMA; and

      f.    Fox Valley, through BLACK, acted as a broker between manufacturers located in PRC and Vibgyor and between XIE and Vibgyor,

transmitted defense articles, namely technical data, to the PRC-based

manufacturers directly or through XIE, received the manufactured defense articles

in the United States to forward to Vibgyor, and facilitated the conduct of BHARAT

VERMA and ANURADHA VERMA.

### D.   Vibgyor Optical Systems

23.     According to information acquired on February 5, 2015 from its

website (www.vibgyoropt.com), Vibgyor "manufactures a wide range (over 8,000

types) of Optical Components, Sub-Assemblies and Systems for Military,

Commercial and Medical Instruments used for daylight, night-vision and thermal

imaging among other applications." The website also states: "In addition to our

operations here in the United States, Vibgyor has the support of our offshore

facilities in Asia, Central America and South America." In addition, Vibgyor's

website provides information on certain of its military products, including

periscopes and a telescope. The website indicates the military application for these

products, including use in armored personnel carriers, howitzers, flame throwers,

and rocket launchers. The website identifies Vibgyor's contact email address

("sales@vibgyoropt.com") and its physical address: 1140 North Phelps Avenue,

Arlington Heights, IL 60004-5030 USA (the "Arlington Heights residence").

24.     On June 6, 2005, U.S. Immigration and Customs Enforcement agents

interviewed BHARAT VERMA. At that time, BHARAT VERMA identified himself

by providing a State of Illinois driver's license. BHARAT VERMA confirmed that he

also used the name "Victor Verma" as it was easier for his customers to understand and remember. BHARAT VERMA informed agents that he started Vibgyor in approximately 1987 and said the company acted as a subcontractor to prime contractors, importing optical lenses and assembling and testing optical products.

25.     According to the Illinois Secretary of State Cyberdrive Website, "Vibgyor Optical Systems, Inc." is an Illinois corporation, its president is "Bharat Verma," and its secretary is "Anuradha Verma." Vibgyor incorporated in 1987 and filed its most recent annual report with the State of Illinois on July 1, 2014.

26.     On April 29, 2010, agents executed a search warrant at the Arlington Heights residence. During the search, agents recovered a document labeled "VIBGYOR OPTICAL SYSTEMS ORGANIZATION CHART," which included the following information: (i) "B. (VICTOR) VERMA" was listed as "PRESIDENT" and "ENGINEERING & QC"; (ii) "A. (ANNE) VERMA" was listed as "VP & FINANCE" (iii) "S. VERMA" was listed as "MATERIALS MANAGER"; and (iv) "S. BHUSHAN" was listed as "PRODUCTION MANAGER."

27.     During the June 6, 2005 interview discussed above, BHARAT VERMA stated that: (a) he purchased optical products and assembled and tested them for his customers; (b)  Vibgyor's customers included government prime contractors and that certain of the work completed by Vibgyor related to military contracts; (c) Vibgyor had approximately five employees, including his ex-wife, ANURADHA VERMA, who assisted in assembly, and his daughter, URVASHI VERMA, who

handled bookkeeping and was responsible for processing orders. Also during this interview, BHARAT VERMA showed agents Vibgyor's business facilities, which were located within the garage of the Arlington Heights residence and advised that Vibgyor did not manufacture products but did assemble them.

### E.   Alpha Precision Industries, Incorporated

28.     According to the Illinois Secretary of State Cyberdrive website, "Alpha Precision Industries, Incorporated" was an Illinois corporation which incorporated in 2007 and involuntarily dissolved on December 9, 2011. Alpha Precision's president and agent were listed as "Siddharth Verma."

29.     According to www.governmentcontractswon.com, a website that provides information on DOD contracts and defense contractors, between 2008 and 2011, API received approximately 56 DOD contracts totaling more than $700,000. The website lists API's industry classification as "Optical Instrument and Lens Manufacturing."

30.     On January 21, 2010, agents interviewed SIDDHARTH VERMA near his Chicago, Illinois home. SIDDHARTH VERMA stated that he was API's owner and sole employee and he described API as a primary U.S. government contractor that provided gaskets and glass lenses to the government. SIDDHARTH VERMA additionally acknowledged being previously associated with Vibgyor, a company he stated was owned by his father.

31.     During the January 21, 2010, interview with agents, SIDDHARTH VERMA initially stated: (a) as a DOD contractor, he knew he was required to purchase goods from U.S. companies or approved vendors; (b) he only sold to the U.S. government items he had purchased from U.S. companies; (c) he never exported technical data to a foreign country; and (d) he only ordered parts from the PRC to fill commercial contracts. After being confronted with information developed during the investigation, SIDDHARTH VERMA said that he wanted to cooperate with agents. SIDDHARTH VERMA subsequently stated that API had been awarded approximately 40 to 50 DOD contracts and that the majority of API's business was comprised of DOD contracts. SIDDHARTH VERMA also stated: (a) in order to be competitive when bidding on DOD contracts, he ordered products from the PRC; (b) upon receiving a DOD technical data package[2] he located a manufacturer in the PRC and emailed the data to the manufacturer using his gmail[3] account; (c) as part of the process by which he was to access DOD technical data, he had to certify that he would not send military critical data to embargoed countries; and (d) he used "Tony Xie" (XIE) of Biomedical to contact companies in

---

[2] A Technical Data Package is a technical description of an item adequate for supporting an acquisition, production, engineering, and logistics support. The description defines the required design configuration or performance requirements, and procedures required to ensure adequacy of item performance. It consists of applicable technical data such as models, drawings, associated lists, specifications, standards, performance requirements, software documentation, quality assurance provisions, and packaging details.

[3] A "gmail" account is an electronic mail, or email, account serviced by Google, Inc.

the PRC to find the lowest price and, at times, he forwarded technical drawings to XIE via email in order for XIE to redraw them with instructions in Chinese for export to the Chinese company. During this interview, SIDDHARTH VERMA also stated that, following an August 2008 seizure of a Vibgyor shipment (discussed below), he asked XIE to accept shipments from the PRC and forward them to Vibgyor in order to prevent seizure by CBP upon entry into the United States.

### F.    US International Inc.

32.    According to the Illinois Secretary of State Cyberdrive website, "US International Inc." was an Illinois corporation that incorporated in October 2008 and involuntarily dissolved on March 9, 2012. US International's president and agent are identified as "Urvashi Bhushan."

33.    On or about January 22, 2010, agents interviewed URVASHI VERMA at her Chicago home.[4] At that time, URVASHI VERMA identified herself as USI's owner and sole employee. URVASHI VERMA stated that she additionally worked at Vibgyor, which was owned by her father, BHARAT "Victor" VERMA. In addition, URVASHI VERMA provided information confirming that she also used the name

---

[4]  At the time of the 2010 interview, URVASHI VERMA was identified as "Urvashi Bhushan," her married name. According to on-line records from the Cook County Clerk of the Circuit Court's website, judgment was entered on a divorce petition for "Urvashi Verma" and her husband, whose surname was listed in the records as "Bhushan," on or about March 14, 2012. According to driver's license information received from the Illinois Secretary of State on or about March 27, 2013, URVASHI VERMA's surname is again "Verma."

"Sonia." More particularly, URVASHI VERMA informed agents that she used email address "sonia@vibgyoropt.com," among others, to conduct her business.

34.     During the January 22, 2010 interview, agents asked URVASHI VERMA about USI, its role as a DOD contractor, and its relationship to Vibgyor. URVASHI VERMA informed agents that she had spoken to her brother (SIDDHARTH VERMA, who had been interviewed by agents the previous day) and that she was going to be cooperative. URVASHI VERMA also stated: (a) USI was a subcontractor used by U.S. Government contractors, operating as a supplier and distributor of metal parts; (b) she was aware that export controlled items could not be sent out of the United States; (c) most of her business was with Vibgyor; (d) she purchased products from the PRC, "finished" the product, and then sold the product to government contractors; and (e) she received drawings of particular parts from prime contractors and forwarded them to Chinese manufacturing companies to obtain quotes for manufacture.

### G.     Biomedical-Optics LLC

35.     According to the California Secretary of State's website, "Biomedical-Optics LLC" is a California limited liability company whose registered agent is "Tuqiang Xie," with an address of "6 Carlina Irvine CA 92620" (*i.e.*, the **Subject Premises**.)

36.     According to information acquired from its website (www.biomedical-optics.com) on or about February 12, 2015, Biomedical "has two facilities in China

[which] can provide various optical components and mechanical parts for optical and mechanical industry." The website further notes that Biomedical's optics manufacturing facility was established in 1963 in Wuhan, Hubei Province (which is located in the PRC). Biomedical's website also provides a contact email address ("info@biomedical-optics.com"), a physical address ("6 Carlina Irvine, CA 92620 USA"—the **Subject Premises**), and a fax number: (949) 468-5001.

37.     According to information provided by XIE during a telephone interview in July 2008 and subsequent in-person interviews in 2008 and 2011,[5] he is Biomedical's president and sole employee. XIE confirmed that he also goes by the name "Tony Xie."

38.     On or about July 10, 2008, agents conducted a telephone interview with XIE. XIE informed agents that Biomedical did not manufacture items in the United States, but facilitated transactions between U.S. customers and manufacturing facilities in the PRC. During this interview, agents also provided XIE with a "Project Shield America" briefing.[6] Agents informed XIE that several items depicted on Biomedical's website were likely subject to import and export

---

[5] On May 18, 2011, HSI agents executed a search warrant at the **Subject Premises**. During execution of the search warrant, agents found large optical lenses. Agents also discovered on XIE's kitchen table a Vibgyor invoice. On May 18, 2011, agents also interviewed XIE.

[6] Project Shield America is an outreach program run by ICE in which individuals and companies involved in high technology research, development, production, or sales are educated as to U.S. customs and licensing laws, identifying potentially illegal exports, and the importance of reporting suspicious contacts to ICE as quickly as possible.

control laws. In a follow-up email, agents provided XIE with literature on export controls and links to websites that outlined various export control lists. On March 2, 2011, agents again provided XIE with a Project Shield America briefing.

39.     On or about November 24, 2008 and May 18, 2011, agents conducted interviews of XIE, during which XIE was asked about his business and his relationships with Vibgyor and members of the Verma family. XIE provided the following information to agents: (a) XIE received technical drawings from "Shawn Verma" and Vibgyor via email; (b) XIE translated the instructions on the drawing into Chinese; and (c) XIE then emailed the drawings and translations to contacts in the PRC for the manufacture of the item contained in the technical drawing. According to XIE, he did not re-draw any of the technical drawings, as he did not have the requisite expertise to do so. Also according to XIE, after he received the price quote from the Chinese manufacturer, he added his cost to the product and sent the completed quote to Vibgyor for payment.

40.     During the March 2, 2011 interview with agents, XIE acknowledged that he never received government approval to export the technical data to the PRC. XIE claimed that "Victor Verma" (BHARAT VERMA) informed XIE that the drawings were for public release. Also during the interview, agents informed XIE that he was not permitted to send technical data for items contained on the USML to the PRC without first obtaining a license.

### H.    Fox Valley Machine Parts LLC

41.    According to information acquired from the South Carolina Secretary of State's website, Fox Valley Machine Parts LLC filed as a domestic limited liability company on May 22, 2009 and its registered agent is "William Black" with an address of "532 Willow Landing Dr. York SC."[7]

### I.    Evidence of Violations of and Conspiracy to Violate AECA

####    a.    *Registration with the Directorate of Defense Trade Controls*

42.    As noted above, DDTC administers the ITAR and regulates the export of defense articles. Individuals desiring access to unclassified technical data are required to complete a "Militaryily Critical Technical Data Agreement," also known as DD Form 2345.[8] All manufacturers, exporters, and brokers of defense articles, defense services, and military critical technical data, as defined on the USML, are required to register with the DDTC.  Registration, standing alone, does not confer a

---

[7] Vibgyor, USI, API, Biomedical, and Fox Valley will be referred to collectively as the "Subject Companies."

[8] The Agreement requires that a contractor certify, under penalty of fine or imprisonment or both, that:

> They acknowledge all responsibilities under applicable U.S. export control laws and regulations (including the obligation, under certain circumstances, to obtain an export license from the U.S. Government prior to the release of military critical technical data within the United States) . . . [and] agree not to disseminate military critical technical data in a manner that would violate applicable U.S. or Canadian export control laws and regulations . . . They will not provide access to military critical technical data to persons other than their employees or eligible persons designated by the registrant to act on their behalf unless such access is permitted by U.S. DoDD 5230.25, Canada's TDCR, or by the U.S. or Canadian Government agency that provided the technical data.

right to export goods, but is instead a prerequisite for the issuance of an export license.

43.    BHARAT VERMA, SIDDHARTH VERMA, and URVASHI VERMA initially signed DD Form 2345 on November 25, 2005, June 16, 2008, and October 13, 2009, respectively.

44.    On or about December 26, 2013, BHARAT VERMA submitted an additional DD Form 2345. On the DD Form 2345, BHARAT VERMA listed himself as "President" of "Vibgyor Optics, Inc.," along with an email address of victor@vibgyoropt.com and an address of "1140 N. Phelps Ave. Arlington Heights, IL 60004." In addition, under the description of relevant business activity, BHARAT VERMA included, "Optical Components, Optical Assemblies & Systems for Daylight, Infrared & Thermal Imaging Assembling & Testing for Industrial & Military Applications."

45.    No DD Form 2345 has ever been submitted by XIE, BLACK, or ANURADHA VEMA.

       *b.*    *No Licenses to Export Defense Articles to the PRC Have Been Issued to the Subjects of the Investigation*

46.    According to information received from the DDTC on or about November 20, 2012, none of the Subject Companies or the aforementioned

individuals has ever been granted a license to export defense articles or defense services to the PRC.[9]

47.    In addition, HSI Special Agent Amber Wigant, the case agent, asked DDTC to inform her if any of the Subject Companies or the aforementioned individuals requests an export license. As of this filing, Agent Amber Wigant has not received information that any of the Subject Companies or aforementioned individuals has done so.

c.    *Analysis of Financial Institution Records*

48.    The government has obtained and reviewed financial institution records pertaining to the Subject Companies. These records indicate significant financial relationships between the Subject Companies, between the Subject Companies and their representatives, and between the Subject Companies and various other entities, including DOD prime contractors and manufacturers based in the PRC. For example, records indicate that API received numerous payments from federal invoices (*e.g.*, invoices sent to DOD) and Vibgyor's income was based almost entirely on funds provided by DOD contractors. Biomedical and Fox Valley each made payments to the PRC-based manufacturers and received funds from Vibgyor or entities owned by the Verma children.

---

[9] As set forth in ¶ 100, in 2010, DDTC did issue a license to BHARAT VERMA and Vibgyor to export a defense article to India.

49.     In addition, financial institution records confirm recent payments from DOD prime contractors to Vibgyor. These payments were then passed through Fox Valley and Biomedical to manufacturers in the PRC. For example, in December 2012, a DOD prime contractor issued a purchase order to Vibgyor for the supply of 375 eyepiece assemblies. The DOD prime contractor mailed a series of checks to Vibgyor as payment for supplied eyepiece assemblies. The most recent payment was mailed in January 2014. After receiving payment from the DOD prime contractor, Vibgyor issued a check to Fox Valley. Shortly after receiving a check from Vibgyor, Fox Valley issued checks to Biomedical for the supply of the eyepiece assemblies. Biomedical subsequently made payments to a manufacturer located in the PRC for the production and shipment of the eyepiece assemblies.

### d.     2008 Trash Pulls

50.     On or about April 25, 2008, ICE Special Agent Calvin Sigur ("Agent Sigur") pulled trash from the Arlington Heights residence. The trash included, among other things, email messages, requests for quote, DOD drawings, shipping documents, packing lists, purchase orders, and discarded boxes with shipping labels from the PRC. One email, dated April 20, 2008, was from an email account utilized by XIE and addressed to "Shawn Verma" at email address alphaprecisionind@gmail.com. The email, recovered from the trash, read in pertinent part as follows:

About prism holder, we have verified the dimension you reminded and we found that this dimension of our product is the same as the drawing showed and also the same as the sample you sent us did.   If you think this was oversized to fix the prism, please let us know what size we should follow.  This Monday, we will ship a shipment including 810 sets, gear assembly and others but I asked them excluded 14 pieces of Telescope Assembly (6510877) is 15Kg and asked the shipping fee of $122/each, I thought you might choose shipping by sea.  Please let me know as soon as possible.

51.    On or about July 2, 2008, Agent Sigur received a licensing determination from the DDTC concerning the Telescope Assembly (6510877) referenced in the recovered email. The State Department determined that the telescope assembly is an article on the USML and therefore subject to AECA export controls. Based on the April 20, 2008, email between XIE and SIDDHARTH VERMA and information provided by Agent Wigant, I believe that both a drawing and sample of Telescope Assembly (6510877), an item on the USML, were exported from the United States for manufacture in the PRC, in violation of AECA.

52.    On or about June 13, 2008, Agent Sigur again pulled trash from the Arlington Heights residence. In addition to other items, Agent Sigur recovered a series of email messages sent on or about June 4, 2008 between XIE and SIDDHARTH VERMA, using the same email addresses. The emails concerned "wrong sized threads on 9240.003.60" and whether a shipment had been cleared by a Los Angeles-based freight forwarder called LE International ("LEI").

53.    Agent Sigur obtained from LEI copies of import documents that appeared to belong to the telescope subassemblies referenced in the email exchange

between XIE and SIDDHARTH VERMA. These documents included a bill of lading, purchase invoice, and Customs Entry form. However, these documents contained contradictory descriptions of the article being imported. The official entry documents, CBP Form 7501 ("Customs Entry Form") described the article as "Spectacle Frame & Mounting Parts." The Bill of Lading described the shipment as containing "Aluminum Fitting Sample." An invoice from Jingzhou Universal Optics, Ltd., a company located in the PRC, was included among the documents Agent Sigur received from LEI. The Jingzhou invoice was made out to "Vibgyor Optical Systems, Inc." with a listed contact as "Mr. Shawn Verma," and described the "Name of Commodity" as "6510877 (Aluminum Fitting)." This description relates to the drawing number for Telescope Subassembly (6510877), which is an article on the USML.

        e.    *August 2008 Customs Seizure*

54.    In August 2008, CBP officers in Wilmington, Ohio, seized a shipment addressed to "Mr. Shawn Verma, Vibgyor Optical Systems, Inc., 1140 North Phelps Avenue, Arlington, Heights, Illinois 6004-5030." An invoice associated with the shipment listed the manufacturer as "Whut Automation Institution" in Wuhan City, China, although the shipment appeared to have been routed through a shipping broker with a Hong Kong address. The invoice described the shipped articles as "70 PCS OPTICAL GLASS VOIL-01531, 1 PCS ALUMINUM FITTING SAMPLE 9240-0003-60, 36 SETS ALUMINUM GLASS ASSEMBLY."

55.     Following the seizure, ATF agents inspected the articles contained in the shipment. The agents determined that the optical articles were defense items as defined in section 27 C.F.R. 447.21, Category I(e) of the United States Munitions Import List. An individual from Vibgyor, identifying himself as "Shawn Verma," subsequently provided agents with Vibgyor's drawings of the articles and a copy of a purchase order from Defense Contractor B. The order was for 700 eyepiece assemblies. The owner of Defense Contractor B provided Drawing No. 12282180, made by the United States Army Armament Research and Development Command ("ARDEC"), which incorporates several part numbers comprising the eyepiece assemblies. The agents compared the drawings provided by Vibgyor with those of the ARDEC and determined that they contained identical data. The contracts associated with the parts made clear that the articles were designed for a weapons system. Therefore, the drawing could not have been lawfully sent to the PRC and no item manufactured pursuant to the drawing could lawfully have been imported from the PRC.

   f.     *November 2008 Customs Seizure*

56.     On or about November 18, 2008, CBP officers in Los Angeles, California, detained a shipment of optical lenses imported from the PRC to Biomedical. The shipment listed the contact as "MR, TUQIANG XIE." CBP officers determined that the optical lenses were identical to those in the August 2008 seizure, which were later determined to be a USML-controlled commodity.

57.    In or around November 2008, BHARAT VERMA submitted an ATF Form 6, Application and Permit for Importation of Firearms Ammunition and Implements of War, relating to the items seized by CBP. The form described the goods to be imported as "lenses and accessories." In the "Certification of Origin" portion of the form, it was listed that the shipment "Contain[ed] parts or components produced by or for the U.S. military or parts of components manufactured with U.S. military technical data or assistance."

58.    According to information provided by Kevin Boydston, Chief of the Firearms and Explosives Imports Branch of ATF, on February 4, 2009, BHARAT VERMA sent an email to a representative of ATF in which BHARAT VERMA claimed that he reviewed the USML and that the imported parts (which he described in his email as for "Lab Equipment" and "Magnifiers") were not covered by the USML.

59.    During the January 21, 2010, interview with SIDDHARTH VERMA, discussed in paragraphs 30 and 31, agents provided a copy of the ATF Form 6 for SIDDHARTH VERMA to review. SIDDHARTH VERMA identified the handwriting on the form as his father's (BHARAT VERMA). In addition, SIDDHARTH VERMA stated that the shipment contained parts for a DOD contract with API and were not for commercial use.

60.     Based on BHARAT VERMA's claim of the items' use, on or about February 6, 2009, ATF noted that no permit was required for importation.[10] However, based on the information developed during the investigation and provided by Agent Wigant, I believe that the seized items were covered by the USML and the ATF Form 6 was only issued after BHARAT VERMA modified his description and fraudulently claimed the items were not for military application.

> g.     *XIE and SIDDHARTH VERMA Export a Defense Article to the PRC*

61.     As described below, on or about September 23, 2008, SIDDHARTH VERMA sent XIE an email containing a defense article (technical data), which XIE, in turn, exported, via email and without a license, to a manufacturer located in the PRC for the purpose of obtaining a price quote from the manufacturer.

62.     According to information provided by Yahoo!, on or about September 23, 2008, a message was sent from email account alphaprecisionind@gmail.com[11] to email account info@biomedical-optics.com.[12] The body of the email included the following:

---

[10] On or about June 8, 2012, Vibgyor filed a motion pursuant to Rule of Criminal Procedure 41(g), asking that the government be directed to return to Vibgyor certain property, including optical items that were seized pursuant to the April 2010 search warrant. In its filing, supported by an affidavit of BHARAT VERMA, Vibgyor claimed that the items did not require a permit for import based on the ATF's February 2009 determination with respect to the seized shipment. Vibgyor's Motion for Return of Property was denied on October 31, 2012 by U.S. District Judge Elaine Bucklo (12 CV 4372, Docket No. 17).

[11] As set forth below, email address alphaprecisionind@gmail.com is linked to SIDDHARTH VERMA. First, according to records provided by Google, Inc., the account is

HI Tony,
Please see the attached RFQ 1[13]
Regards,
Shawn Verma
Alpha Precision Industries

Attached to the email was a one-page diagram or schematic entitled "Shaft,

Magnification" and bearing drawing number 13492666, which contained language

stating, "U.S. Army Missile Command" and "Distribution Statement C. Distribution

---

subscribed to "Shawn Verma," and was created on July 19, 2007. In multiple email communications sent from the email account, the writer identifies himself as "Shawn Verma" and includes a signature block stating: "Alpha Precision Industries, 1819 S. Michigan Ave #809 Chicago, IL – 60616." According to information received from the Illinois Secretary of State Cyberdrive website, the registered agent for Alpha Precision Industries, Inc. was "Siddharth Verma" with an address of "1819 S. Michigan Ave. Ste 809, Chicago, Illinois 60616." In addition, according to information received from the Cook County Recorder of Deeds website and the Cook County Assessor's Office website, between approximately August 15, 2005 and May 18, 2011, the property of 1819 S. Michigan Ave., Unit 809, Chicago, Illinois was recorded as owned by "Siddharth Verma." In addition, during the January 21, 2010 interview, described above, SIDDHARTH VERMA granted agents permission to search his computer, and assisted agents in locating and reviewing email communications. Agents observed on SIDDHARTH VERMA's computer emails sent from or received by email address alphaprecisionind@gmail.com.

[12] As set forth below, email account info@biomedical-optics.com is linked to XIE. First, according to information provided as Yahoo!, the address is listed as an alternate email address for subscriber "Tuqiang Xie," with a billing address of "6 Carlina, Irvine, CA 92620 US," (the **Subject Premises**) and an assigned email address of tqxie@yahoo.com. During a March 2, 2011 interview, XIE acknowledged that he utilized tqxie@yahoo.com and info@biomedical-optics.com, among others.

[13] Based on my training and experience and information provided to me by the case agent, "RFQ" is a common abbreviation for "request for quotation," a phrase used in commercial transactions to solicit bids from manufacturers and suppliers to provide goods or services.

Authorized to U.S. Government Agencies and Their Contractors For Control of

Critical Technology."[14]

63.    According to information provided by Yahoo!, a number of emails were

sent between email address tqxie@yahoo.com and email address

zhangbing123200@yahoo.com.cn,[15] with the final email being sent on September 25,

2008. The emails were a series of replies to prior emails and written in Chinese.

According to a Department of Homeland Security ("DHS") interpreter, who

translated the email chain into English, one email sent from tqxie@yahoo.com

stated (as translated) the following:

> Mr. Zhang: Wish you well!
> The attachment is machine part's (13492666) drawing(s) and requirement(s).
> Please let me know the quoted price for 100 pieces and the delivery time.
> Thanks,
> Tuqiang

---

[14] DOD established a standardized framework and markings for managing, sharing, safeguarding, and disseminating technical documents in accordance with AECA and other applicable law. DOD policy requires that technical documents contain a distribution statement and established a coding system for such documents. For example, technical documents assigned Distribution Statement A are approved for public release and may be made available or sold to the public and foreign nationals, companies, and governments, including adversary governments, and may be exported. By comparison, a technical document assigned Distribution Statement C authorizes distribution to U.S. Government agencies and their contractors but does not permit the release of the technical documents to foreign nationals, adversary governments, nor does it allow for exportation. It is unlawful to export technical documents designated or marked as Distribution Statement C without obtaining an export license.

[15] ".cn" is a top-level domain in the PRC. Domain names are combination strings that identify the control of an internet address. "Top-level domains" are the root of the name. In www.domain.com, for example, ".com" is the top-level domain.

64.     According to the DHS translator, the subsequent email in this series, which was dated September 25, 2008, was sent from zhangbing123200@yahoo.com.cn to tqxie@yahoo.com, stated (as translated) the following:

> Mr. Xie: Wish you well!
> Price for 100 pieces: 8 USD/piece, 50 days
> Zhang, Liangbin

65.     According to information provided by Yahoo!, on or about September 25, 2008, an email was sent from email address info@biomedical-optics.com to email address alphaprecisionind@gmail.com. Attached to the email was a document addressed to "Mr. Shawn Verma Alpha Precision Industries, Inc." which included the following table:

| Item No. | Part No. | Item description | Quantity Unit | Price per unit | Extended Price | Estimated Delivery |
|---|---|---|---|---|---|---|
| 01 | 13492666 | Shaft | 100/each | $11.20/each | | 50 days |

The attachment to the email further noted: "F.O.B. point: China."[16]

66.     During the May 18, 2011 interview described above, XIE identified "Mr. Bindliang Zhang" as the husband of his sister-in-law. XIE also stated that "Mr. Zhang" was the general manager of Universal Optics Manufacturing Company's factory in Jingzhou, Hubei Province, which is in the PRC.

---

[16] Based on my training and experience, "F.O.B." is a term utilized in shipping. "F.O.B. point: China" would indicate that the shipment's originating location was the PRC.

67.    HSI received a pretrial certification[17] from the DDTC regarding the technical drawing entitled "SHAFT, MAGNIFICATION" and bearing drawing number 13492666, which was attached to the email sent from SIDDHARTH VERMA to XIE, on or about September 23, 2008. According to the DDTC, the technical drawing is a defense article, namely, technical data covered by Category IV(i) on the United States Munitions List.[18]

68.    According to information provided by an agent with the DOD-Office of Inspector General, DOD drawing number 13492666 relates to a magnification shaft used in the sight of a TOW anti-tank missile mounted on either a Bradley Infantry or Calvary Fighting Vehicle.

   h.    *URVASHI VERMA Exports and Attempts to Export a Defense Article to the PRC*

69.    As described below, on or about December 22, 2009, URVASHI VERMA exported a defense article (technical data) to a manufacturer located in the PRC for the purpose of obtaining a price quote. On or about January 19, 2010, URVASHI VERMA then attempted to ship a defense article (the item which was

---

[17] A pre-trial certification is issued by DDTC and provides an initial determination as to whether a specific item constitutes a defense article or defense service. The DDTC finding is provided for pre-trial activities such as subpoenas, search warrants, and indictments.

[18] USML Category IV enumerates launch vehicles, guided missiles, ballistic missiles, rockets, torpedoes, bombs, and mines. Category IV(i) references technical data and defense services directly related to these enumerated items.

subject of the technical data) to the manufacturer at their address in the PRC via United Parcel Service.

70.     According to information provided by Google, Inc., on or about December 22, 2009, an email was sent from email address sonia.bhushan81@gmail.com to email address zxmj9810@hotmail.com. The body of the email included the following:

> Thanks very much for the quotation. I have not sent sample because I have not received it from customer due to Christmas vacation; hopefully he will send it soon; I will ship upon receipt.
>
> [. . .]
>
> Also, can you please quote the following items?
>
> [. . .]
>
> US-9551 Qty: 3800 pcs Mat: CRES 301 Dwgs: See attached
>
> [. . .]
>
> PLEASE KEEP ALL DWGS CONFIDENTIAL!!!
> Best regards,
> Sonia

Attached to the email were six data files, including one containing a schematic or drawing entitled "Plate, Indicator." The drawing also stated: "US Army Communications and Electronics Command," "US-9551," and bore drawing number 5009551.

71.     According to information received from Google, on or about December 22, 2009, an email was sent from zxmj9810@hotmail.com to

sonia.bhushan81@gmail.com. The email was a reply to an earlier email, included a quote for the production of four items, and contained a signature block from the Assistant Manager, Sales & Export Dept., Xiamen Zhaoxing Mould Co., Ltd, at an address in the PRC. The sender's signature block also listed the company's website: www.eymould.com.

72.     On or about January 20, 2010, agents learned from a security supervisor from United Parcel Service ("UPS") of a package that was processed at the UPS store in Arlington Heights, Illinois, and destined for the PRC. According to the UPS security supervisor, he inspected the contents of the parcel and found that the items contained within the parcel did not match the description of the contents provided to UPS by the sender.

73.     Agents responded to the UPS store and inspected the parcel. The return information on the package listed "Sonia Bhushan." The sender's information additionally included email address sonia.bhushan81@gmail.com. The package was addressed to "Att Marissa Huang . . . Xiamen Zhaoxing Mould Co. Ltd . . . Xiamen City FU CHINA."

74.     UPS employees provided agents with paperwork related to the shipment. Included in the paperwork was a document, purported to have been signed by Sonia Bhushan on January 19, 2010. The signed document included the following: "By signing below, [Principal Party in Interest] certifies that the commodity, technology or software exported from the United States (U.S.) is in

accordance with U.S. export control laws and that all statements provided to UPS are true and correct."

75.    Agents recovered from within the package addressed to Xiamen two small metallic objects. The objects were subsequently submitted to DDTC for review.

76.    HSI has received a pretrial certification from the DDTC regarding the technical drawing attached to the December 22, 2009 email sent from URVASHI VERMA's email account to zxmj9810@hotmail.com, and regarding one of the metallic objects URVASHI VERMA attempted to ship to the PRC via UPS. According to the DDTC pretrial certification: (a) the metallic object is a "Plate, Indicator" and is a defense article covered by category XII(e) of the USML; and (b) the technical drawing titled "Plate, Indicator, Drawing Number 5009551" is technical data covered by Category XII(f) on the USML.[19]

77.    According to information provided by an agent with the DOD-Office of Inspector General, DOD part number 5009551 is a component plate used in night vision image intensification systems.

78.    Among the items seized during the April 2010 search of the Arlington Heights residence was a document entitled "Purchase Order 193334," which was addressed to "Vibgyor Optics Inc. Attn: Victor." The purchase order was from

---

[19] USML Category XII enumerates fire controls, range finders, optical and guidance and control equipment.

Defense Contractor A and included the following: "Dept of the Army dwg #5009551" and "Material must be in new condition and of domestic origin."

79.     In addition to the above document, during the search of the Arlington Heights residence, agents also seized invoices, requests for quote, and a ledger containing information on purchases by defense contractors (the "Ledger"). Among the entries contained in the Ledger was one identifying Defense Contractor A, a purchase order number of 193334, an item part number of 5009551 and US-9551, and a shipment delivery date of 02-11-10. In addition, the remark column of the ledger stated, "USI 200 ea". As set forth previously, based on the information developed during the investigation, I believe "USI" is a reference to URVASHI VERMA's company, US International.

   i.     *BHARAT VERMA and URVASHI VERMA Export an Item They Believe to be a Defense Article to the PRC*

80.     As described more fully below, on or about August 19, 2009, URVASHI VERMA, on behalf of and working with Vibgyor, BHARAT VERMA, and ANURADHA VERMA, exported an item they believed to be a defense article (technical data),[20] via email and without a license, to a manufacturer located in the

---

[20] Based on the application for export filed by BHARAT VERMA and Vibgyor, discussed below, BHARAT VERMA believed that an item referred to as a "mount, viewer" was USML-protected and the export of its technical data or the import of the manufactured item would have been prohibited. As set forth herein, BHARAT VERMA and URVASHI VERMA, notwithstanding this belief, exported the schematics for the mount viewer to the PRC and imported the manufactured item to fill DOD contracts. Subsequently, the DDTC determined that the item was not covered by the USML, although DDTC made this

PRC for the purpose of obtaining a price quote from the manufacturer. DDTC later determined that the item was not USML-restricted, but made this determination only after Vibgyor agreed to produce the items—using parts manufactured in the PRC—for two defense contractors. Indeed, one of the contracts with a defense contractor was filled by Vibgyor, using items manufactured in the PRC based on the exported technical data (which had been sent to the PRC before BHARAT VERMA submitted the application for a license for export) prior to DDTC determining the items were not covered by the USML.

81.     As noted above, in April 2010, agents executed a search warrant at the Arlington Heights residence, which is both Vibgyor's registered business premises and BHARAT VERMA's personal residence. Among the seized items were three documents entitled "Quotation" and dated July 20, 2009. These documents each described a "mount bracket" or "mount viewer" and quoted a price for 262 units. The documents were addressed to API (to the attention of "Shawn Verma"), to Defense Contractor A (a prime DOD contractor), and to a third DOD contractor. The quotations were purported to have been signed by "Anne Williams" (*i.e.,* ANURADHA VERMA), "Sonia Bhushan" (*i.e.,* URVASHI VERMA), and "Victor Verma" (*i.e.,* BHARAT VERMA), respectively. The quotations each referenced part numbers: all three cited part number "NSN: 5855-01-046-7272," while two of the

determination several years after rejecting the application for license to export submitted by BHARAT VERMA on behalf of Vibgyor.

three quotations also referred to the same part by a different number: "SM-D-850340-1."[21] The due date for each of the quotations was July 21, 2009.

82.     According to information received from the Defense Logistics Agency ("DLA"), the agency responsible for soliciting and awarding bids for the manufacture of items to supply to the United States military, on or about July 7, 2009, DLA posted a solicitation through its internet-based bid system for 262 units of part number 5855-01-046-7272. According to the information received from DLA, the request for quotation was to have been submitted by July 21, 2009.

83.     According to information provided by an agent with the DOD-Office of Inspector General, DLA posted more than one solicitation for the manufacture of national stock number 5855-01-046-7272, and awarded multiple contracts for its manufacture based upon bids submitted by DOD prime contractors. Defense Contractor D (a DOD prime contractor) was awarded one such contract for the manufacture of the part.

84.     According to Agent Wigant's review of the Ledger, she observed that it contained an entry listing Defense Contractor D as a customer for 642 units of part number "SM-D-850340-1." The purchase order was listed as "250134" and included a shipment delivery date of March 1, 2010. In the remarks column of the ledger was listed: "USI 650 EA." Based on the context of this and other entries in the Ledger,

---

[21] According to information from the Federal Logistics Information System, an on-line database administered by Defense Logistics Agency, National Stock Number 5855-01-046-7272 and part number SM-D-850340-1 refer to the same item, a "mount, viewer."

information provided to me by the case agent, and my knowledge of the investigation, it appears that "USI" was a reference to URVASHI VERMA's company.

85.    During the April 2010 search of the Arlington Heights residence, agents also recovered a document entitled "Invoice" printed on Vibgyor letterhead and dated January 26, 2010. This invoice was addressed to Defense Contractor D, included order number 250134 and cited part number SM-D-850340-1. The invoice noted that 642 items had been ordered, 335 items had been shipped on January 26, 2010, and $16,582.50 was due.

86.    According to information provided by Defense Contractor D, Vibgyor filled an order for 642 units of part number SM-D-850340-1/NSN: 5855-01-046-7272 in a series of two shipments in January 2010. According to Defense Contractor D, the parts were originally ordered from Vibgyor in August 2009.

87.    Also in the Ledger was an entry listing Defense Contractor A as the customer for purchase order #192612. The part number was listed as "SM-D-850340-1" and "US-B0340-1." The purchase order quantity was 453 and the shipment delivery date was for "03/30/10." In the remarks column of the ledger, "USI" was listed. As noted above, USI appears to be a reference to URVASHI VERMA's company.

88.    During the April 2010 search of the Arlington Heights residence, agents also recovered documents purported to have been made by Defense

Contractor A and listing "Vibgyor Optics Inc." as the vendor. The documents were labeled "Purchase Order Number 192612" and called for an order of 453 items entitled "Mount, Viewer" and cited part number "SM-D-850340." The documents also listed a government contract number and, under a heading entitled "additional requirements," included the following provisions: "CERTIFIED FOR NATIONAL DEFENSE UNDER DMS REG 1 D0A3," and "DFAR CLAUSE 252.225-7001 BUY AMERICAN ACTS AND BALANCE OF PAYMENTS PROGRAM IS APPLICABLE."

89.     According to information provided by Defense Contractor A, between March 2010 and May 2011, they had a series of communications with representatives from Vibgyor regarding order number 00192612. According to information provided by Defense Contractor A, "Victor" indicated that there was a delay in filling the order and that the delivery would not occur as scheduled. On or about May 5, 2011, Defense Contractor A sent a fax to "Victor" canceling the order.

90.     According to information provided by Google, on or about August 18, 2009, an email was sent from email address sonia.bhushan81@gmail.com[22] to email

---

[22]     According to information received from Google, email account sonia.bhushan81@gmail.com is registered to "Sonia Bhushan," and was created on October 29, 2008. As noted above, URVASHI VERMA's surname when married was "Bhushan." As noted above, during the January 22, 2010 interview, URVASHI VERMA stated that she used an email address with the name "sonia" in it. In addition, as set forth below, on January 19, 2010, a package intended for the PRC was provided for shipment to the UPS Store in Arlington Heights, Illinois. The sender provided the name "Sonia Bhushan" with an address of "49 N Wolf Rd. Ste 1R Wheeling IL." The sender also provided email address "sonia.bhushan81@gmail.com," which, although a different account than that identified by

address zxmj9810@hotmail.com.[23] Attached to the email was a series of schematics or drawings, including one for an item labeled "Mounting Bracket Assembly, M60" and bearing drawing number "SM-D-850340." The body of the email included the following:

> Dear Maggie,
>
> Can you please quote the following items, please quote the best price for item #1, I have a feeling customer has order already and is waiting for best price!
>
> 1. US-B0430 Qty: 700 pcs Mat: Various component dwgs attached
>
> [. . .]
>
> Please do keep the ALL the dwgs confidential especially for item US-B0430.
>
> Look forward to your response!
>
> Best regards,
> Sonia

91.     The email described above was a reply to an earlier email sent from email address zxmj9810@hotmail.com. The prior email was signed by "Maggie" and included a signature block noting that the sender was the Assistant Manager, Sales

---

URVASHI VERMA during the 2010 interview, also included the name "Sonia." During the January 22, 2010 interview, URVASHI VERMA informed agents that she used a storage space located at 49 N. Wolf Road, in Wheeling, Illinois, to receive deliveries.

[23]   According to information received from Hotmail, email account zxmj9810@hotmail.com is registered to "Candice Wu" and was created on April 11, 2009. According to Hotmail, the subscriber provided a state and country of Fujian, China. According to information acquired from www.eymould.com on March 29, 2013, the website belongs to "Xiamen Agcoson Machinery Co., Ltd." According to the website, the company is a specialized supplier of mould designing and manufacturing. The company lists its address in Fujian Province, China, and lists a contact email: zxmj9810@126.com.

& Export Dept., Xiamen Zhaoxing Mould Co., Ltd. The signature block also included

a telephone number beginning with "86" – the country code for telephone numbers

in the PRC.

92.     In a series of emails sent between October and December 2009, the

users of email addresses sonia.bhushan81@gmail.com and zxmj9810@hotmail.com

discussed the anticipated shipment and additional orders of an item referred to as

"US-B0340." For example, in an email sent from sonia.bhushan81@gmail.com to

zxmj9810@hotmail.com on November 10, 2009, URVASHI VERMA wrote, "can you

please quote 500 pcs more of US-B0340? I need to send price to customer ASAP!!!"

93.     According to information provided by Google, on April 23, 2010, an

email was sent from sonia.bhushan81@gmail.com to email address

eymould@hotmail.com. The email included the following:

> Dear Marissa,
>
> Thanks for the detail, I will confirm again & advise Mon.
>
> Also- PLEASE DO NOT SENT ANY ITEMS VIA DHL TO US AT THIS TIME.
>
> Please do prepare parts t350 pcs US-B0430[24] to ship to India & advise shipping details.
>
> Best regards,
> Sonia

---

[24] At various times, it appears that the email author transposed the part number, occasionally listing the part as "430" instead of "340." Based on information provided to me by the case agent and my understanding of the content and context of the communications, I believe the references are to the same part number.

94.     According to information provided by Google, on April 28, 2010,

sonia.bhushan81@gmail.com received an email from eymould@hotmail.com stating:

> Dear Sonia,
>
> Could you please kindly advise detailed info of India company? Because we had received the information from you as follows:
>
> UBC Machinery Stores
> 146 Ajmeri Gate
> Delhi, India 11006
>
> But there is no tel/fax number, could you please help? Thanks.

Best regards,
Marissa

95.     The sender's signature block included the following: "Zhaoxing

(Xiamen) Mould Co., Ltd Address: Xiamen City, Fujian Province, China Contact

Person: Marissa Huang."

96.     According to information provided by the DDTC, on or about March 24,

2010, BHARAT VERMA and Vibgyor submitted an application for a license for the

permanent export of unclassified defense articles and related unclassified technical

data. The application was purported to have been made by "Bharat Verma." The

application identified the country of ultimate destination as "China" and provided

the name and address of the foreign end-user as "Xiamen Mould Co. Ltd.

Gaoqinanba Road, Xiamen City, Fujian Province CH." The application listed

Vibgyor as the source and manufacturer of the commodity, which was described as

"technical data for an metal bracket, govt part number SM-D-850340-1." The application further noted the quantity of the commodity (720 pieces), that the defense article type was "Technical Data," and listed the USML category number as "VII(i)."[25] Attached to the application was a schematic or drawing for an item labeled "Mounting Bracket Assembly, M60." Based on Agent Wigant's review of the drawing, it is identical to one of the schematics attached to the August 18, 2009 email sent from URVASHI VERMA to the PRC. Therefore, the application was submitted by BHARAT VERMA after the technical data had already been exported to the PRC.

97.     According to information provided by the DDTC, on or about March 25, 2010, the application for license submitted by BHARAT VERMA and Vibgyor was denied. The denial letter issued by DDTC included the following statement:

> Per 22 CFR 126.1(a) of the International Traffic in Arms Regulations (ITAR), The Peoples Republic of China (PRC) is a proscribed destination with a presumption of denial for requests for the export of defense articles, technical data or defense services controlled under the U.S. Munitions List (USML). In addition, the PRC is also subject to sanctions under Section 902(a)(3) of the Foreign Relations Act, Fiscal Years 1990 and 1991 (PL 101 - 246) which suspended all licenses for the export of items controlled under the USML and further preclude approval of this request.

98.     According to information provided by DDTC, on or about March 31, 2010, BHARAT VERMA and Vibgyor submitted another application for license for

---

[25] USML Category VII enumerates tanks and military vehicles. Category VII(i) references technical data and defense services directly related to tanks and military vehicles.

permanent export of unclassified defense articles and related unclassified technical

data. The application was for the identical part number, the same quantity, listed

the same USML category number, and appended the same drawing or schematic as

in the March 24, 2010 application. The only differences in the two applications

involved the country of ultimate destination, which had been changed to "India,"

and the name and address of the foreign end-user, which was provided as "UBC

Machinery Stores 146 2nd Floor, Ajmeri Gate, Delhi 110006 IN."

99.    According to information provided by the DDTC, based on the

information submitted by BHARAT VERMA and Vibgyor in the March 31, 2010

application, on April 8, 2010, DDTC issued a license for the export of the technical

data to India. However, the license included the following condition, among others:

> It shall not be construed as implying U.S. Government approval or
> commitment to authorize future exports of any article (equipment or
> technical data) on the Munitions List, or a U.S. Government
> commitment with regard to any proposed manufacturing license or
> technical assistance agreements which may result from an authorized
> export.

100.    According to information provided by the DDTC, the April 8, 2010

license was the only one ever granted to BHARAT VERMA and/or Vibgyor for the

export of USML-enumerated defense articles.

101.    During the 2010 search of the Arlington Heights residence, agents

recovered a document entitled "Vibgyor Optical Systems, Inc Non-Disclosure

Agreement" which purported to have been executed on April 12, 2010 between

BHARAT VERMA and an individual representing UBC Machinery Stores. Among other requirements, the agreement provided that UBC Machinery Stores would comply with the terms of the USML, and cited provisions of the ITAR. The agreement stated that the representative of UBC Machinery Stores,

> Acknowledge[s] and understand[s] that any technical data related to defense articles on the U.S. Munitions List, to which I have access or which is disclosed to me under this license by (company name) is subject to export control under the International Traffic in Arms Regulations (Title 22, Code of Federal Regulations, parts 120-130). I hereby certify that such data will not be further disclosed, exported, or transferred in any manner, to any other foreign national or any foreign country without the prior written approval of the Office of Trade Controls Licensing, U.S. Department of State.

> [. . .]

> § 124.8(5). The technical data or defense service exported from the United States in furtherance of this agreement and any defense article which may be produced or manufactured from such technical data or defense service may not be transferred to a person in a third country or to a national of a third country except as specifically authorized in this agreement unless the prior written approval of the Department of State has been obtained.

102.   As noted above, the government has received and reviewed financial institution records related to the Subject Companies. Based on a review of these records, none of the Subject Companies ever made a payment to UBC Machinery Stores, including during 2010. On or about March 16, 2010, Defense Contractor D made a payment of approximately $31,432 to Vibgyor. According to information provided by Defense Contractor D, this payment was related to the purchase of 642 units of part number SM-D-850340-1 from Vibgyor.

      *j.*    *BHARAT VERMA Attempts to Fraudulently Reroute Shipments*
            *Originating in the PRC*

103.   As discussed above, email communications between URVASHI VERMA and a representative from Xiamen, along with the modified license for export executed by BHARAT VERMA and Vibgyor, indicate an attempt to reroute the shipment of defense articles manufactured in the PRC through India, in order to disguise their true nation of origin and obscure the AECA violations. In addition, during the execution of the search warrant at the Arlington Heights residence on April 29, 2010, agents found documents indicating BHARAT VERMA's attempt to similarly reroute shipments of items manufactured by UOM.

104.   Among the documents recovered from the search at the Arlington Heights residence was one on Vibgyor letterhead and entitled "Fax Transmission." The fax was addressed to "Mr. Yu" of "UOM" and dated February 26, 2010. In relevant part, the document included the following:

Dear Mr. Yu,

1. You must have noted that, we have been quite reluctant in business with UOM for quite sometime.

2. Reason: The competition reported against Vibgyor for buying from China, UOM in particular. [. . .]

3. The we (sic) it looks that we can work together, if we prove that: UOM & Vibgyor are partners (May be we have to sign some paperwork) I will let you know, how to do this.

4. Via Europe: Do you have any of your customers/representatives in Europe & we can place orders with them to avoid the problem "So called do not by (sic) from China" regulation.

5. Please respond by fax "Not by e-mail" Everything by fax ("Not email")

Best Regars (sic)
Victor

105.   In addition, the February 26, 2010 document entitled "Fax Transmission" included the following:

"FAX ONLY"

"NOT E MAIL"

106.   During the search at the Arlington Heights residence, agents also recovered a document on UOM letterhead which contained markings indicating that it was sent via fax on March 17, 2010. The fax contained two separate portions, one dated March 11, 2010, and the other dated March 17, 2010, on the same page. The document included the following:

March 11, 2010

Dear Victor,

Have passed your message to our Europe representative, [Representative A] who is a bit concerned about what exactly you want. It is as easy as it sounds. Why don't you set up a company in Canada, or Mexico, or India?

The only way to ship through Europe is to set up a company in the UK to trade. There are a lot of costs involved in doing this, and annual accounts to produce, tax returns to submit, VAT monthly returns, bank accounts to open, shipping costs, etc., etc...

Please comments.

Best regards
S.L. Yu

March 17, 2010

Hi Victor,

I would suggest you to let your daughter to set-up a company
somewhere in the U.S.A.. UOM may sell parts to this new company.

What do you think?

Best regards
S.L. Yu

      *k.*     *BLACK and Fox Valley Join the Conspiracy to Violate AECA*

107.   As set forth below, starting in approximately June 2011, Biomedical
and Vibgyor recruited BLACK and Fox Valley to operate as a go-between for
transactions involving the defendants and the PRC manufacturers.

108.   As discussed above, Yahoo! provided the government with information
related to certain email accounts utilized by XIE. Within this information were
multiple emails between XIE and BLACK. On or about March 9, 2012, a search
warrant was approved for an America On-Line ("AOL") email account utilized by
BLACK ("BLACK AOL Account.") On May 3, 2012, October 25, 2013, and August 5,
2014, additional search warrants were authorized for the BLACK AOL Account.
The information regarding emails set forth below was acquired from AOL pursuant
to the search warrants for the BLACK AOL Account.

109.    On or about September 21, 2011, BLACK sent a message to one of XIE's email accounts that included the following:

> Tony Xie,
> I have attached two drawings and would like to know if you can make these parts for me and if so how much would they cost and when could I get them.
>
> SM-D-771433 59 ea. (no markings/part number required on part)
>
> SM-C-771436 118 ea.

Attached to this email were drawings for two parts, "HOUSING, PRISM OBJECTIVE, VIEWER," [SM-D-771433] and "RETAINER, PLATE" [SM-C-771436]. Both were marked "U.S. Army Electronics Command Procurement and Production Directorate."

110.    On or about September 22, 2011, XIE sent an email to BLACK, stating in relevant part: "attached is the quotation for SM-D-771433/36 . . . Since these parts may need importer license and permit, we cannot take any responsibility for customs clearance. If you order these items, you may need to send us a copy of your importer license and permit due to legal problem." In the attachment, the quote provided for a price and quantity of the two requested items, and noted, "F.O.B. point: China."

111.    In addition to the above communication, XIE and BLACK also emailed each other regarding parts different from those discussed above. More specifically, on or about October 18, 2011, BLACK emailed XIE, stating in pertinent part: "Tony,

please quote the attached drawings." Attached to the email were several technical data drawings, including three for part numbers 8626206, 11741232, and 11741122.

112.   On October 19, 2011, XIE responded to BLACK in an email, writing in pertinent part: "Since most of your prints have sensitive words, we are not sure if we can send them to our factory for quotation. Please remove them or use your own drawings."

113.   On October 21, 2011, BLACK sent an email to XIE, stating in pertinent part: "Here are the drawings you need, please quote price and delivery." Attached to this email were the three drawings mentioned above, however, based on a review and comparison of these drawings to those mentioned in paragraph 112 above, they had been modified in that government markings were removed and handwriting was added. The government markings that were removed in the lower right hand corner of each drawing, and included the design command, the part description and the drawing number. In place of the government marking for part no. 11741232, the handwriting included "Plug-1232." In place of the government marking for part no. 8626206, the handwriting included "bearing, pivot: 6206." And, in place of the government marking for part no. 11741122, the handwriting included "Support-1122."

114.   Information acquired from AOL confirmed that BLACK continued to order products from XIE. For example, on October 14, 2013, BLACK sent an email to XIE stating, "Tony Please see attached drawings. The last order of 200 pcs

[pieces] . . . was made with the wrong material. Customer has rejected & returned all 200 pcs." That same day, XIE replied, writing, "Hi, Bill, I talked the material with our chief engineer and he told the material was correct."

115.    In addition to the emails between XIE and BLACK, information provided by AOL pursuant to the search warrants revealed direct communications between BLACK and manufacturers in the PRC. For example, on or about April 11, 2012, BLACK sent an email to zxmj9810@126.com which said, in relevant part:

> Marissa,
> The customer found 4 holes.
> But they are the wrong size and depth according to the print.
> What size holes are in the sample I sent???
> How do we fix the problem??

116.    As set forth above, zxmj9810@126.com is an email address previously reflected on Xiamen's web page. In addition, Marissa (Huang) was the name of the Xiamen employee to whom URVASHI VERMA attempted in approximately January 2010 to send the small metallic object seized after agents were alerted to the shipment by the UPS security supervisor.

117.    Information provided by AOL also confirmed the on-going relationship between Vibgyor and XIE, and Vibgyor and manufacturers based in the PRC, with BLACK acting as a go-between. For example, on or about March 26, 2012, XIE sent an email to BLACK stating: "The attached are the processing drawings for your two POs [purchase orders] and please review and confirm them as soon as possible." On March 27, 2012, BLACK forwarded XIE's email to email address

anne@vibgyoropt.com, writing, "Anne, Please look over drawings from Tony, let me know if okay to proceeded."

118.    Similarly, on March 7, 2012, "Marissa" sent an email to BLACK, to which was attached a technical drawing bearing drawing number SM-D-850112. That same day, BLACK forwarded the email to two different email addresses: anne@vibgyoropt.com and victor@vibgyoropt.com.[26] The email stated, in relevant part: "Victor, Please see questions about part#SM-D-850112-1."

119.    On March 28, 2012, an email was sent from anne@vibgyoropt.com to the BLACK AOL Account as a reply to an earlier email. The email included the following:

> Can you please ask [Universal Optics representative] to send at
> least 3 pcs ASAP, to allow us to
> start First Article inspection report
> This will give us an excuse to extend
> the delivery date for the balance of
> the order and avoid any threat of
> cancellation.
> We request 3 PCS ASAP, PLEASE
> Best regards,
> Victor
> Vibgyor Optical Systems

120.    On or about June 8, 2012, BLACK received an email from "sales@vibgyoropt.com," purportedly signed by "Victor". The email included the following:

---

[26] As noted above, BHARAT VERMA included this email address on his most recent DD Form 2345 submitted to DDTC.

Dear Bill,
Now that tony has agreed for 25% upfront, the volume of business with you via Tony is going to increase. Once the business increases, our competition starts investigating our sources and start causing trouble for us and our source, as they did in the past.

121.    Similarly, the email sent from BLACK to XIE in which BLACK's customer purportedly rejected 200 pieces of an item made from the wrong material was in response to an email sent from email address anne@vibgyoropt.com. On October 15, 2013, BLACK forwarded XIE's response to the same email address, writing, "Anne, See comments from Tony below."

122.    On August 8, 2014, BLACK received an email from sales@vibgyoropt.com, noting open orders and directing BLACK to "verify that they have been placed." On August 13, 2014, BLACK sent a reply email stating, "Anne, Tony said your PO [purchase order] 13-0925-02 will be ready on August 20th. He is checking on the other orders."

   *l.*    *URVASHI VERMA and BHARAT VERMA Misrepresent the Origin of Certain Defense Articles to Defense Contractor A*

123.    As set forth above in ¶¶ 69 through 79, URVASHI VERMA exported and attempted to export a defense article, namely a "plate, indicator" and its technical data, to the PRC in order to fill a contract for Defense Contractor A. As set forth below, URVASHI VERMA and BHARAT VERMA falsely represented to Defense Contractor A that the defense articles would be produced in the United

Non-Instrumentality Protocol

States and received payment based on these false representations, which were provided to Defense Contractor A via facsimile and via UPS, an interstate carrier.

124.   As noted above, agents recovered a purchase order, bearing number 193334, for the production of 169 copies of a "Plate, Indicator" during a search of Vibgyor's business premises in 2010. Agents have also received from Defense Contractor A copies of documents related to the transaction, including a copy of the purchase order bearing number 193334.

125.   According to the terms of the contract contained in the purchase order, dated December 31, 2009, the shipment of items was to be sent from Vibgyor's premises in Arlington Heights, Illinois, to Defense Contractor A's location in Pennsylvania via UPS ground (an interstate carrier), and was due on February 11, 2010, or sooner. In addition, the contract terms explicitly stated: "MATERIAL MUST BE IN NEW CONDITION AND OF DOMESTIC ORIGIN." The contract also included a government contract number, stated that the item was certified for national defense, and referenced a Department of the Army Drawing – namely, the same drawing emailed from sonia.bhushan81@gmail.com to zxmj9810@hotmail.com and discussed in ¶ 70 above.

126.   According to the documents provided by Defense Contractor A, on or about January 14, 2010, its purchasing department requested from Vibgyor a signed, formal acknowledgment of the order set forth in the December 31, 2009 purchase order. On that same date, Defense Contractor A received a facsimile which

listed "P.O [Purchase Order]: 193334 RCVD [Received] Victor." The header listed on the facsimile included the following: "01/14/10 12:31 FAX 847 818 0799 VIBGYOR OPTICS," indicating that the fax had been sent over the fax number listed on Vibgyor's web page. The acknowledgment did not amend any of the terms of the purchase order, including the requirement that the items be of domestic origin.

127.    According to information received from Defense Contractor A, in approximately April 2010, it received from Vibgyor via UPS the defense articles that were the subject of the contract set forth in purchase order 193334. Included in the shipment were a series of documents, including one entitled "Certificate of Compliance" and purportedly signed by "S Bhushan," who was identified as the "Q.C. Manager." Above S. Bhushan's signature was the following: "IT IS HEREBY CERTIFIED THAT THE ARTICLE LISTED AND FURNISHED AGAINST ABOVE REFERENCES PURCHASE ORDER COMPLIES WITH DRAWINGS, PROCESS & SPECIFICATIONS SET FORTH BY PURCHASE ORDER." The document also specifically referenced "PURCHASE ORDER NO.: 193334."

128.    According to a representative of Defense Contractor A, the company did not know that Vibgyor acquired the defense articles from a manufacturer located in the PRC, and the certificate of compliance provided to Defense Contractor A contained a material misrepresentation by stating that the terms of the contract had been satisfied.

   *m.*  *Vibgyor Continues to Contract with DOD Prime Contractors and Misrepresent the Location of Manufacture*

129. As set forth above, agents have analyzed financial institution records related to Vibgyor, which includes records of recent payments made by DOD prime contractors to Vibgyor. Based on this review, agents contacted multiple DOD contractors identified as conducting recent business with Vibgyor. Based on interviews with representatives of the companies, Vibgyor, through BHARAT VERMA and ANURADHA VERMA, misrepresent to the DOD Prime Contractors the location of the manufacture of the product subject of the contracts. Vibgyor largely communicates with the DOD Prime Contractors about purchase orders, requests for quotes, and contracts via email and fax.

   *i.*  <u>*Defense Contractor F*</u>

130. On or about June 25, 2014, agents met with representatives of Defense Contractor F. During this meeting, the representatives of Defense Contractor F stated that 100% of the company's business is from Department of Defense contracting. A representative estimated the company's annual sales to be approximately $13 million. According to information acquired from governmentcontractswon.com, in 2013, Defense Contractor F was awarded 602 DOD contracts totaling approximately $9.4 million.

131. Defense Contractor F's representatives stated that the company began working with Vibgyor in approximately 2011 or 2012 and that their points of

contact were "Victor" and "Anne." One of Defense Contractor F's representatives stated that he/she specifically asked VERMA where its products were manufactured and VERMA replied that the raw glass for the lens manufacturing was made in Germany, but that all other parts were manufactured at Vibgyor. According to the representative, VERMA represented that Vibgyor was the manufacturer of the products ordered by Defense Contractor F.

132.   According to the representatives of Defense Contractor F, the requests for quote (RFQs) and purchase orders for their dealings with Vibgyor contained language that all products must be of domestic origin. According to the representatives of Defense Contractor F, they largely communicated with Victor and Anne via email or fax. According the representatives of Defense Contractor F, the company made payment by mailing checks to Vibgyor.

133.   According to the representatives of Defense Contractor F, the company had current and recent purchase orders with Vibgyor. In addition, in early 2014, Defense Contractor F was awarded a contract from DOD for which Vibgyor was the subcontractor. As part of the contract, the Defense Logistics Agency attempted to conduct a site inspection at Vibgyor, which Vibgyor declined. As a result of Vibgyor refusing the site inspection, the contract was subsequently cancelled.

134.   According to a review of financial records, between June 2013 and the end of February 2014, Defense Contractor F made payments totaling approximately $248,000 to Vibgyor, including more than $35,000 during 2014.

<ins>*ii.*</ins>      *Defense Contractor G*

135.    On or about June 24, 2014, agents met with representatives of Defense Contractor G. According to govermentcontractswon.com, in 2013, Defense Contractor G was awarded 16 DOD contracts worth approximately $1.1 million. According to the representatives of Defense Contractor G, the company's initial contacts with Vibgyor began in around May or June 2013. According to the representatives, they communicated with "Bharat Verma" and "Anne Williams," but rarely spoke directly with them. Instead, most communications were via fax.

136.    According to representatives of Defense Contractor G, they believed all parts received from Vibgyor had been manufactured in the United States and the company would not have issued a purchase order to or continued business with Vibgyor had they known that the parts were being manufactured in the PRC. According to representatives from Defense Contractor G, Vibgyor provided the company with Certificates of Conformance/Compliance indicating that the parts satisfied the terms of the contract that had been provided by Defense Contractor G. The contracts provided by Defense Contractor G to Vibgyor included export control language and specifically referenced AECA and the ITAR.

137.    According to representatives of Defense Contractor G, payments were made to Vibgyor via check, which would be mailed to the company. According to financial institution records, during 2014, Defense Contractor G made payments

totaling approximately $12,000 to Vibgyor in 2014, including a payment of $7,200 on May 29, 2014.

138.   On or about June 30, 2014, a representative from Defense Contractor G placed a consensually recorded telephone call to BHARAT VERMA. During the call, the representative from Defense Contractor G stated that he/she had been contacted by a federal agent about Defense Contractor G's dealings with Vibgyor. The representative from Defense Contractor G repeatedly asked BHARAT VERMA where Vibgyor manufactured its products. BHARAT VERMA replied, "They came from a company called Vibgyor Optical System, which is in United States."

### iii.   Defense Contractor H

139.   On or about June 24, 2014, agents met with representatives of Defense Contractor H. According to the representatives of Defense Contractor H, a significant portion of the company's business involves foreign military sales. As such, the company is familiar with import and export regulations and the company frequently seeks export licenses. According to governmentcontractswon.com, in 2013, Defense Contractor H was awarded 12 DOD contracts worth approximately $1.5 million.

140.   According to the representatives of Defense Contractor H, the company initially made contact with Vibgyor in late 2011 or early 2012, although the

company did not have any business with Vibgyor since approximately spring or summer 2013.

141.   According to a representative of Defense Contractor H, he/she usually dealt with "Victor" or "Anne Williams" at Vibgyor. According to the representatives of Defense Contractor H, they believed the products Vibgyor provided were manufactured in the United States. The representatives from Defense Contractor H stated that the company would not have continued its business relationship with Vibgyor had they known its products were manufactured in the PRC.

**J.     Pen Register Information**

142.   On January 27, 2015, Rubén Castillo, Chief Judge of the United States District Court for the Northern District of Illinois, approved the installation and use of a pen register and trap and trace device ("pen/trap") on the BLACK AOL Account. As set forth below, the pen/trap confirms on-going communications between BLACK and XIE, VIBGYOR, and manufacturers located in the PRC. Based on information provided to me by the case agent and my understanding of the investigation to date, information provided by Agent Wigant, and the information acquired through the pen/trap, I believe that the Subject Companies continue to import defense articles manufactured in the PRC to provide to DOD prime contractors to fill DOD contracts.

143.   For example, according to information from the pen/trap, on January 28, 2015, emails were sent from the BLACK AOL Account to XIE, email address anne@vibgyoropt.com, and yzj-optics@elp.rr.com.[27]

144.   According to information provided by AOL, on January 28, 2015, the BLACK AOL Account received an email from XIE and one from email address yzj-optics@elp.rr.com.

### K.   Surveillance of the Subject Premises

145.   As noted above, Biomedical's website currently lists the **Subject Premises** as its address. In addition, records available on the California Secretary of State's website lists the **Subject Premises** as the entity address for Biomedical. In addition, between approximately February 5, 2015, and February 10, 2015, agents have conducted surveillance at the **Subject Premises** and repeatedly observed automobiles registered to XIE and his wife at the location. Agents also observed a woman, believed to be XIE's wife, leaving the **Subject Premises** on two occasions. More specifically, on February 5, 2015, surveillance observed a white Toyota Prius registered to XIE and his wife parked in front of the **Subject Premises**. On February 6, 2015, surveillance observed the same Prius and a white Acura SUV, also registered to XIE and his wife, parked at the **Subject Premises**.

[27] According to the website for Hubei Yangtze Photoelectric Instrument Co., Ltd., located at www.yzj-optics.com, the company is located in Hubei, China, and the company "is a high-tech manufacturer specialized in the research, design, production and marketing of optical components."

Surveillance then observed a woman enter the Acura and depart the area. On February 10, 2015, surveillance observed the same Acura parked at the **Subject Premises**. Surveillance then observed a woman and a child exit the **Subject Premises**, enter the Acura and depart the area.

### L.      Business Records

146.    Based on my training and experience and the training and experience of those agents with whom I have consulted, I know that companies engaged in the business of brokering and/or importing items maintain records related to their business operations. These records include requests for quote, purchase orders, invoices, financial records, and correspondence with both customers and suppliers. Indeed, during the 2011 search of the **Subject Premises**, agents recovered these types of documents.

## TRAINING AND EXPERIENCE ON DIGITAL DEVICES

147.    As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives,

floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of a premises it is not always possible to search digital devices for digital data for a number of reasons, including the following:

a.      Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment. There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched.

b.      Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c.      The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing 500 or more gigabytes are now commonplace. Consequently, just one device might contain the equivalent of 250 million pages of data, which, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling. Further, a 500 gigabyte drive could contain as many as approximately 450 full run movies or 450,000 songs.

d.      Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet. Electronic files saved to a hard drive can be stored for years with little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, *i.e.*, space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before they are overwritten. In addition, a

computer's operating system may also keep a record of deleted data in a swap or recovery file. Similarly, files that have been viewed on the Internet are often automatically downloaded into a temporary directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment. Recovery also can require substantial time.

e.      Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole. Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a

paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use. Computer file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

       f.     Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to

demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

g.      In this case, the review of digital device will be conducted away from the **Subject Premises**. This is necessary for several reasons. First, XIE often sends communications to manufacturers in the PRC via email, and these communications are usually in Chinese. Therefore, it is likely that a translator will need to review communications recovered from the **Subject Premises**. In addition, it is likely that Agent Wigant, the case agent, will need to review information contained in digital devices recovered from the Subject Premises. Because the government will be executing search warrants in two different states contemporaneously, it is impossible for the case agent to conduct reviews at both locations.

148.   In addition to what has been described herein, the United States has attempted to obtain this data by securing search warrants for email accounts utilized by XIE. However, these email search warrants did not necessarily reveal all evidence contained on XIE's digital devices. Indeed, during the 2011 search warrant at the **Subject Premises**, described above, agents recovered additional documents stored on XIE's computers that had not been transferred via email. Therefore, the government would not have had the means to acquire this evidence without a search warrant for the Subject Premises, to include digital devices.

**CONCLUSION**

149.    Based on the above information, I respectfully submit that there is probable cause to believe that conspiracy to violate the Arms Export Control Act, and violations of the Arms Export Control Act, in violation of Title 18, United States Code, Section 371 and Title 22, United States Code, Section 2778, have been committed, and that evidence and contraband relating to this criminal conduct, as further described in Attachment B, will be found in the **Subject Premises**, as further described in Attachment A. I therefore respectfully request that this Court issue a search warrant for the premises located at 6 Carlina, Irvine, California, more particularly described in Attachment A, authorizing the seizure of the items described in Attachment B, pursuant to the protocol described in the addendum to Attachment B.

/s/
_____
Nathaniel Lewis
Special Agent
Homeland Security Investigations

Subscribed and sworn
before me this 17th day of February, 2015

ROBERT N. BLOCK
_____
**HON. ROBERT  N. BLOCK**
United States Magistrate Judge

## ATTACHMENT A

## DESCRIPTION OF PREMISES TO BE SEARCHED

The subject premises is a single-family residence located at 6 Carlina, Irvine, California. The residence is a two-story structure, with stone covered walls facing the street on the first story, and off-white walls on the second story. Affixed to the wall to the right of the garage is a small white sign with the numeral "6" displayed.

A photograph of the subject premises is included below:



# ATTACHMENT B

## I.   ITEMS TO BE SEIZED

1.   For the time period of May 19, 2011, to the present, the items to be seized are evidence and contraband of violations of 18 U.S.C. § 371 and 22 U.S.C. § 2778, namely:

a.   Optical lenses, optical systems, and components for same; technical data for optical systems; schematics or other technical diagrams bearing markings identifying them as for military use, or provided by Vibyor Optical Systems, Inc., Fox Valley Machine Parts, Bharat Verma, Anuradha Verma, Urvashi Verma, Siddharth Verma, or William Black.

b.   "Records," "documents," "programs," "applications," and "materials" related to the operation of Biomedical Optics, LLC. The records, documents, programs, applications, and materials are to include the following: requests for quote, purchase orders, invoices, shipping documents, tax documents, and correspondence with manufacturers and/or customers, to include email and fax communications, and other business records.

c.   Communications concerning the manufacture, import, or export of optical lenses, optical systems, or defense articles.

d.   All records, documents, programs, applications, and materials referencing Bharat "Victor" Verma, Anuradha "Anne Williams" Verma, Urvashi "Sonia" Verma, Siddharth "Shawn" Verma, Tuqiang "Tony" Xie, or William "Bill" Black, Vibgyor Optical Systems, Inc., Biomedical-Optics, Fox Valley Machine Parts, Alpha Precision, or US International.

Non-Instrumentality Protocol

e.    Records of payments from Vibgyor Optical Systems, Fox Valley Machine Parts, other DOD prime contractors, and records of payments to manufacturers or brokers.

2.    With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

a.    evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

b.    evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.    evidence of the attachment of other devices;

d.    evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

e.    evidence of the times the device was used;

f.    passwords, encryption keys, and other access devices that may be necessary to access the device;

**Non-Instrumentality Protocol**

g.      applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

h.      records of or information about Internet Protocol addresses used by the device;

i.      records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

3.      As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

4.      As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives,

**Non-Instrumentality Protocol**

3

floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II.    SEARCH PROCEDURE FOR DIGITAL DEVICES

5.    In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.    Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 60 days from the date of execution of the warrant.  If additional time is needed, the government may seek an extension of this time period from the Court on or before the date by which the search was to have been completed.

b.    The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.    The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

**Non-Instrumentality Protocol**

ii.     The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

c.     When searching a digital device pursuant to the specific search protocols selected, the search team shall make and retain notes regarding how the search was conducted pursuant to the selected protocols.

d.     If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

e.     If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

f.     If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

g.     If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of items to be seized, the government may retain forensic copies of the digital device but may not access them (after the time for searching the device has expired) absent further court order.

**Non-Instrumentality Protocol**

h.      The government may retain a digital device itself until further order of the Court or one year after the conclusion of the criminal investigation or case (whichever is latest), only if the government, within 14 days following the time period authorized by the Court for completing the search, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending).  Otherwise, the government must return the device.

i.      Notwithstanding the above, after the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

6.      In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.      Any digital device capable of being used to commit, further or store evidence of the offense(s) listed above;

b.      Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.      Any magnetic, electronic, or optical storage device capable of storing digital data;

d.      Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

**Non-Instrumentality Protocol**

e.      Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.      Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.      Any passwords, password files, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

7.      The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

**Non-Instrumentality Protocol**